IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 8, 2015 Session

**STATE OF TENNESSEE v. MARC BAECHTLE**

**Appeal from the Criminal Court for Shelby County**
**No. 1201214    James C. Beasley, Jr., Judge**

_____

**No. W2014-01737-CCA-R3-CD  -  Filed April 15, 2016**

_____

A Shelby County jury convicted the Defendant, Marc Baechtle, of rape of a child, aggravated sexual battery, and rape.  The trial court dismissed the convictions for aggravated sexual battery and rape based upon the statute of limitations and sentenced the Defendant to twenty-five years for the rape of a child conviction.  On appeal, the Defendant contends that the trial court erred when it: (1) denied his motion to suppress his statement to police; (2) denied his motion to dismiss based upon a violation of the prompt notification requirement of the Interstate Agreement on Detainers; and (3) denied his motion for a bill of particulars.  The Defendant also challenges the sufficiency of the evidence.  After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ALAN E. GLENN, J., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Marc Baechtle.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jennifer Nichols Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

### I. Facts and Procedural History

This case arises from the Defendant's inappropriate physical contact with the minor victim ("the victim"), the daughter of the Defendant's girlfriend.  On March 8, 2012, a Shelby County Grand Jury indicted the Defendant for rape of a child, aggravated

sexual battery, rape, and statutory rape by an authority figure. At the time, the Defendant was serving a fifteen-year sentence in Florida as part of a December 2008 plea agreement. Pursuant to the Florida plea agreement, the Defendant pleaded guilty to six counts of sexual battery and lewd and lascivious conduct involving the victim.

On March 12, 2012, the State sent to Florida a capias and detainer for the Defendant. Florida officials acknowledged receipt of the detainer on March 30, 2012; however, Florida officials did not give notice of the Tennessee proceedings to the Defendant until October 11, 2012. On the same day, the Defendant requested prompt disposition of the indictments. On October 24, 2012, Florida officials offered the State of Tennessee temporary custody of the Defendant, and the documents were forwarded to Tennessee officials on November 2, 2012. On November 15, 2012, Tennessee officials accepted temporary custody of the Defendant, and Shelby County Sheriff's deputies retrieved the Defendant on December 17, 2012. The Defendant was arraigned on the charges in this case on January 8, 2013.

## A. Pretrial Motions

In January 2013, the Defendant filed numerous motions. At issue on appeal are: (1) a motion to dismiss the indictment for the State's failure to comply with the requirements of the Interstate Compact on Detainers ("Interstate Compact"); (2) a motion for a bill of particulars; and (3) a motion to suppress the Defendant's inculpatory statements to Florida investigators.

On February 21, 2013, the trial court held a hearing on the Defendant's pretrial motions. At the hearing, Agent Ryan Bliss, a Florida Department of Law Enforcement agent, testified about his involvement in the Florida investigation of the Defendant. In September 2007, Agent Bliss became involved in the case because of the multi-jurisdictional nature of the case. The victim alleged that the Defendant had forcibly raped her and forced her to watch pornography on multiple occasions. These offenses had allegedly occurred in different areas of Brevard County, Florida, as well as in Tennessee and South Carolina.

Agent Bliss interviewed the victim first, obtained an arrest warrant for the Defendant, and then interviewed the Defendant on September 24, 2007. The Defendant was arrested leaving his apartment in Seminole County, Florida and transported to the Seminole County Sheriff's Department where Agent Bliss interviewed him. The Defendant's handcuffs were removed and then Agent Bliss reviewed *Miranda* rights with the Defendant. The Defendant agreed to speak with Agent Bliss during an audio-recorded interview.

2

The interview began at around 10:50 p.m. The Defendant was seated on one side of the table while Agent Bliss and two other investigators sat on the other side of the table. Initially, the Defendant denied any sexual contact with the victim. The Defendant recounted his history with the victim's mother ("M.D."). He was very forthcoming about the details of his relationship with M.D. and elaborated in his responses to questions. He talked at length about M.D.'s refusal to allow him to see his children for the past sixteen months following their separation and his frustration regarding his inability to spend time with his children. The Defendant posited that M.D. and the victim fabricated these allegations to prevent the Defendant from testifying about M.D.'s "bad" parenting during any future custody hearings. The Defendant referenced several email exchanges between him and M.D. wherein she refused to allow him to see his children. The investigators asked about whether he had access to those emails still, and he confirmed that he did and then the following exchange occurred:

| | |
|---|---|
| Defendant: | Well I mean, I just know that I just know that whatever happens, I didn't do it so I mean, you know whatever pointed questions you got I'll try and answer you but otherwise than that I really do think that I need to have an attorney to sift through your interrogatories make sure that you know you get the proper paper work, documentation whatever it is you need to support my claims you know what I'm saying and we need to go ahead and just you know get the process going because. . . |
| RB: | All right. |
| Defendant: | . . . I don't think that ah you know we're getting anywhere here. I mean I, I certainly would love to be able to tell you she's a f**king liar and she's trying to jam me up and make sure that I never see my kids again but that, that, that doesn't help any you know it's not going to, I'm, I'm not going to be able to stand up in front of the judge and say she's a liar and this doesn't help me you know. |
| RB: | No. |
| Defendant: | I have to have my own lawyer and my own investigators who can back track and find this information that you all are asking about whether it be |

3

you know the fraud she perpetrated here or that [the victim] has you know probably a dossier this thin[g] from her schooling years talking about how she's a, a pathological liar and that she lied about this incident and then you know got this teacher in trouble and then backed up and said it didn't happen you know things like that you know I'm saying, I need to make sure that I get those resources together because frankly you guys are investigating me.

RB: Right.

Defendant: You know what I'm saying? I think that the only way that I'm going to prove that there's even a shred of integrity to myself is by you know being able to have an attorney directed to handle you know get gathering up this evidence that you guys need so you can see that this is a case of some f\*\*king girl ok whose blinded by whatever life this style that this new guy's providing her mother and they've always been about the money and they've always been about the life style the rich and famous ok and I just think that . . .

Agent Bliss believed these references to an attorney were in relation to M.D.'s attempts to prevent him from seeing his children because the statements were made when he was speaking about his custody concerns and not during a discussion of the molestation.

The Defendant requested multiple breaks over the course of the three-hour interview and breaks were always provided upon his request. The investigators began to question some of the Defendant's statements and a discussion ensued regarding his exposure and the potential effects of telling the truth about what had occurred between him and the victim. Investigators encouraged the Defendant to "tell the truth," but no promises were made regarding charges or punishment. The Defendant again referenced an attorney during this portion of the interview as follows:

WI: The easiest course of action for you that keeps you on the shortest end of jail is to be honest about how it happened.

Defendant: Can't I be honest with an attorney present?

WI: Sure.

4

Defendant: I mean doesn't it make sense that you know.

WI: You, you, you . . .

Defendant: I mean but doesn't it make sense that if I'm facing life in prison for these various accusations that I would want to have an attorney?

WI: Well that's up to you.

Defendant: You know?

WI: I just . . .

Defendant: For advice?

WI: Totally, totally up to you.

Defendant: You know what I'm saying , it's not that I, it's not that I don't want to continue telling you about our lives together ok, and filling you in on you know the nuisances [sic] of this that and the other . . . .

WI: [Defendant] you, you . . .

Defendant: . . . but . . . .

WI: . . . you were read your rights and, and I think you guys actually read . . . .

Defendant: Yeah they did it.

WI: . . . time . . . .

Defendant: Yeah.

WI: And you know you certainly had the right to an attorney I, I can tell you that an attorney and I'll be straight forward and up with you, and attorney's going to tell you to keep mouth shut, don't don't cooperate to any degree.

On several occasions throughout the interview an investigator asked the Defendant if he was being coerced or threatened, and he answered in the negative. Following a break at the Defendant's request, the Defendant admitted to investigators that sexual interactions occurred between the victim and him over the course of eight or nine months, but he denied engaging in sexual intercourse with the victim.

According to Agent Bliss, the purpose of the interview was to determine whether there were any acts involving penetration or if the sexual contact was limited to "fondling." Agent Bliss already had a search warrant for the Defendant's apartment drafted at the time of the interview. The search warrant was based upon information from the Defendant's girlfriend about a computer in his residence used to view child pornography. The victim had described the computer used to show her pornography, and the Defendant's girlfriend confirmed the presence of the same computer in his residence.

During the execution of the search warrant on the Defendant's residence, the computer was recovered as well as recordings, one of which contained footage of the Defendant molesting the victim. The affidavit submitted in support of the search warrant listed a date of September 27, 2007; however, the judge signed the search warrant on September 25, 2007. According to Agent Bliss the September 27 date on the affidavit was a typographical error and the date of the affidavit should have been September 25, 2007.

At the end of the hearing, the State agreed to obtain a copy of the paperwork as given to the judge or an affidavit from the judge about when the paperwork was submitted to him and the hearing was continued to February 27, 2013. At this hearing, the Defendant, through counsel, requested additional time to gather evidence in support of his motions. In order to accommodate the additional time requested, the Defendant agreed to waive his rights under the Interstate Compact except for those issues previously raised in his pending motions to dismiss the indictment. The hearing was continued to March 20, 2013.

At the March 20, 2013 hearing, the State submitted a signed affidavit by the Florida trial court judge confirming that he received both the search warrant and the supporting affidavit on September 25, 2007. After entering the affidavit into the record, the trial court made a finding that "the search warrant was valid on its face, notwithstanding the typo."

As to the Defendant's motion to dismiss the indictments for failure to comply with the Interstate Compact, the Defendant conceded that at the time of the hearing he was unable to demonstrate any prejudice caused by the delay in notice of the detainer and the

6

pre-indictment delay. He reserved, however, the right to be heard on the detainer motion and the pre-indictment delay "if and when" he was able to demonstrate prejudice. This issue was not raised again. Nonetheless, the Defendant submitted the paperwork exchanged between Tennessee and Florida regarding the capias and detainer for the Defendant's presence in Tennessee. He also presented evidence, through Tennessee Bureau of Investigation ("TBI") Agent John Sullivan, that the TBI received information about these allegations in the summer of 2009, and this information was shared with the Shelby County District Attorney's Office. The State elicited testimony that the victim and M.D. had been "uncooperative" with the Florida investigation and that the victim refused to testify. By 2011, M.D. contacted Agent Sullivan and expressed a willingness to participate in the Tennessee prosecution of the Defendant. Agent Sullivan then contacted the Shelby County District Attorney's Office about moving forward with the prosecution.

On May 31, 2013, the trial court issued written orders denying the Defendant's motion to dismiss the indictment for violation of the interstate agreement on detainers, motion to dismiss the indictment for unreasonable delay, and motion to suppress the Defendant's statement.

On September 30, 2013, the trial court denied the Defendant's motion for a bill of particulars. Specifically, the Defendant sought an initial statement made at the Satellite Beach Police Department that was not in the State's discovery materials. The trial court denied the motion on the basis that the State had provided its entire file to the Defendant and would be required to make an election of offenses at trial.

## B. Trial

At the Defendant's trial on these charges, the parties presented the following evidence: The victim, twenty-three years old at the time of trial, testified that she moved to Memphis, Tennessee, with her mother, M.D., when she was nine or ten years old. She identified the Defendant as M.D's boyfriend and the father of her two younger siblings, ages ten and twelve at the time of trial. The victim recalled moving into the Defendant's three bedroom house in the fall of 2000. She was ten years old at the time and entering the fourth grade.

The victim testified that, initially, the Defendant assumed a parental role with her by helping her with homework and enrolling her in soccer. Up until this time, she had not had a father figure in her life. The Defendant also disciplined the victim by "grounding" her. She said that she felt like the Defendant "grounded [her] all the time" in an attempt to isolate her from other people. The victim recounted the events that occurred one day after school not long after she and M.D. had moved into the

7

Defendant's home. Her mother worked until 6:30 or 7:00 p.m. at night, but the Defendant was at home when the victim rode the school bus home. One day she walked in after school, and the Defendant was watching pornography on the computer. He told the victim to come and watch with him and told her "how good it feels." The Defendant touched the victim over her clothing and told the victim how much he loved her and that he wanted to make her "feel good."

The victim testified that she did not tell M.D. about this incident because she was scared. She explained that she was "finally" in a "good home" with "stability," and she did not want to ruin that situation. The victim identified a photograph of her, her aunt and uncle, and M.D. dated January 13, 2001. She confirmed that the Defendant had touched her inappropriately by the time the photograph was taken. The victim testified that between her eleventh birthday on July 29, 2001, and the birth of her sister on August 26, 2011, the sexual abuse occurred daily. She described a typical day as M.D. leaving for work in the morning, after which she and the Defendant would work out at the gym. The Defendant would then take the victim to "the pool and tan," followed by eating a burrito at a Sonic located next to the gym. After eating, the two would return home, shower, and then watch porn together. She said that she and the Defendant "would play a game of what they're doing is what we would do to a certain extent." She said the Defendant "would go down on me." When further questioned, she said that the Defendant "would use his mouth on my vagina with no panties on." She described the Defendant as also using his nose when he "would go down on [her]." She said that he told her his "bigger nose" was a "perk" and "one of his tools."

The victim testified about an event that occurred in the fall of 2011. She recalled that her sister, a newborn, was asleep while she and the Defendant watched pornography involving a barn and hay. Once again, the two acted out what they had watched, and the Defendant performed oral sex on her and she touched his penis at his request. She said that the Defendant was instructive, teaching her how to perform various acts. The victim said that she would get on top of the Defendant, straddle him, and move back and forth. She said that her vagina would touch his penis but no penetration occurred. She said that when she told him "it hurt" he would "back off." She said these interactions occurred in the living room, in her bedroom, and in the nursery.

The victim testified that when she returned to school after the summer of 2011, the sexual abuse no longer occurred daily but "at least" three times a week. After her sister was born, the Defendant slept in her bedroom when her sister would sleep in bed with M.D. After the victim's brother was born, on September 21, 2003, the Defendant slept in her room more consistently. Her younger brother was born with complications and, therefore, M.D. wanted him to be close to her. She said that the Defendant did not typically have her perform oral sex on him while M.D. was in the house instead opting

8

for "touching." The victim said that "every time anything ever happened" the Defendant "would always go and ejaculate after." She recalled the first time the Defendant had her perform oral sex on him was after her brother was born.

The victim testified that she and her mother moved to Florida and, ultimately, due to her "acting out," M.D. enrolled her in an Outward Bound program. During her participation in this program, the victim disclosed her interactions with the Defendant to a counselor. The following day she spoke with a police officer.

On cross-examination, the victim stated that the contact began in the January before her sister was born in 2001. She agreed that she had told Satellite Beach Police that she was eleven or twelve when the contact occurred even though she was testifying at trial that the contact began when she was ten years old. The victim agreed that initially she and the Defendant engaged in "some touching" and kissing, and in June 2001, the sexual abuse became a daily occurrence. The victim could not explain why the Satellite Beach Police report indicated that she had told officers that the daily contact began when she was sixteen. She stated that the sexual abuse had stopped by the time she was sixteen. The victim confirmed that the Defendant never anally penetrated her nor did he ever physically restrain her. She could not explain why the Satellite Beach Police report indicated that she stated that the Defendant "forcefully anally raped" her. She said that she did not recall any of her statements to the Satellite Beach Police officers.

During a break, the audio recording of the victim's statement given at the Satellite Beach Police station was played for the victim. The victim then confirmed that she had told officers that she had "just turned 16 when it became a daily thing" and that the Defendant had "forcefully anally raped" her.

The victim testified that the Defendant digitally penetrated her for the first time during the summer of 2001 but stated that she could not recall anything else about this incident. She said that she did not recall telling Satellite Beach Police officers that the Defendant first penetrated her around her thirteenth birthday.

Parker Rice testified that she worked for Outward Bound from 2007 to 2010. She recalled working with the victim on a twenty-day "course" that occurred in August and September 2007. On this particular course, Ms. Rice served as an assistant instructor. She explained that there were three-instructor teams, comprised of a lead, an assistant, and an intern, that ran each course with approximately eleven students. The course is composed of camping and canoeing with a "break" at the middle with three days and two nights of "solo." A solo is where the students are placed in individual campsites to reflect and write. The instructors take turns making "solo checks" where they walk a distance from each individual site to observe and check on the student's welfare. Ms.

9

Rice described seeing the victim during one of the "solo checks" visibly upset and crying. Ms. Rice said that this behavior was uncharacteristic in her experience with the victim during the course. The victim had difficulty speaking with Ms. Rice because she was crying but also because "it was really hard for her to get the words out." As the two spoke, the victim related that the Defendant had been sexually molesting her for "quite a long time." She did not provide much detail but explained why she needed to disclose the Defendant's contact at this time. The discussion with the victim was reported to the Florida Department of Children and Families.

Eric Bell, a Satellite Beach Police Department patrol sergeant, testified that he was notified of a potential sexual abuse case and sent an investigator out to an Outward Bound course location to speak with the victim. It became clear early on that the offenses might be multi-jurisdictional so Sergeant Bell made initial contacts with other agencies. When the victim completed her Outward Bound course, she met with investigators at the Satellite Beach Police Department. The victim identified the Defendant as the perpetrator. Sergeant Bell described the victim as "relaxed," "very determined," and "focused" during the interview. After speaking with the victim, the investigators reviewed the information and began attempting to confirm dates and locations that the victim had provided.

Sergeant Bell testified that he and Agent Bliss met with the Defendant and that Agent Ivey was also present during portions of the interview. He described the Defendant as "very sure of himself." He said that the Defendant wanted to "take control" during the interview and appeared confident and self-assured. Sergeant Bell recalled that the Defendant displayed indignation at points during the interview, exasperation at other points, and engaged in "deflecting" throughout the interview.

Wayne Ivey, the Brevard County sheriff at the time of trial, testified that, in September 2007, he was a Florida Department of Law Enforcement resident agent assigned to the Brevard County field office. As such, he became involved in the investigation of the victim's allegations of sexual abuse. Sheriff Ivey assigned Agent Bliss to the investigation but was regularly updated on the progress in the investigation and participated in the Defendant's interview. He stated that the interview was conducted at the Seminole County Sheriff's Office. Sheriff Ivey said that he entered the interview while the interview was in progress. He described the Defendant as "very confident" at the beginning of the interview. He confirmed that the Defendant was read his *Miranda* rights and that the Defendant agreed to speak with investigators.

Ryan Bliss, a Florida Department of Law Enforcement agent, testified about his involvement in the investigation. After Agent Bliss spoke with the victim, the Defendant was developed as a suspect and arrested. Agent Bliss met with the Defendant after his

10

arrest at the Seminole County Sheriff's Department. The interview was audio-taped, and the Defendant was issued *Miranda* rights and agreed to speak with the investigators. Agent Bliss said the interview lasted approximately two and a half hours, during which the Defendant initially denied the allegations but ultimately made admissions. Agent Bliss identified the audio-recording and the transcript of the interview. The recording was played for the jury.

After hearing the evidence, the jury convicted the Defendant of rape of a child, aggravated sexual battery, and rape. The trial court dismissed the convictions for aggravated sexual battery and rape based upon the statute of limitations and sentenced the Defendant to twenty-five years for the rape of a child conviction to run consecutively to his Florida sentences. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it: (1) denied his motion to suppress his statement to police; (2) denied his motion to dismiss based upon a violation of the prompt notification requirement of the Interstate Agreement on Detainers; (3) denied his motion for a bill of particulars. The Defendant also challenges the sufficiency of the evidence.

### A. Motion to Suppress Defendant's Statement

The Defendant asserts that the trial court erred when it denied his motion to suppress his statement to police, maintaining that he invoked his right to counsel and his confession was coerced. The State responds that the Defendant did not unambiguously invoke his right to counsel and that he was not coerced into admitting he engaged in sexual contact with the victim. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be

11

afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

## 1. Right to Counsel

The Defendant contends that he unambiguously invoked his right to counsel and the State responds that the Defendant's references to an attorney during the interview were "far from an unambiguous request to stop the interview until an attorney was present."

In its motion denying suppression of the statement, the trial court made the following findings:

> A total review of the [D]efendant's 69 page statement indicates that the [D]efendant is very talkative and wants to go into great detail about his involvement with the victim's mother and there [sic] personal domestic problems. He also goes into very lengthy and detailed explanations of all types of issues and eventually into the facts of the case. The law requires that "A suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Davis v. United States. After reviewing the entire statement in context this Court is not prepared to rule that the [D]efendant made it sufficiently clear to officers that he wanted to have an attorney present. Although he discusses having an attorney it never gets to a point that he wants an attorney present. The Court does not find that objectively speaking this case is in the same posture as the Tidwell case. In fact . . . the Defendant is . . . reminded that it is up to him and that he certainly has a right to have an attorney present. [sic] The Court finds that the [D]efendant never made a clear and unambiguous request for an attorney during the interrogation.

The Fifth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment, *see Malloy v. Hogan*, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself [.]" The corresponding provision of the Tennessee Constitution provides "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Encompassed within these constitutional provisions is the right to counsel, which is applicable whenever a suspect requests that counsel be present during police-initiated custodial interrogation. When a

12

suspect invokes that right to counsel, police must cease questioning until counsel is present. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966); *see also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *State v. Stephenson*, 878 S.W.2d 530, 548 (Tenn. 1994).

Although courts have clearly held that all police questioning must cease when an accused invokes the constitutional right to counsel, there has been uncertainty as to what constitutes a valid invocation of that right under the Fifth Amendment and Article I, Section 9. When the Supreme Court decided *Miranda*, for example, it did not adopt a rigid formula for invocation of the Fifth Amendment right to counsel, but stated generally that the right was effectively invoked when a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking. . . ." *Miranda*, 384 U.S. at 444-45.

The Supreme Court later narrowed this standard and held that "[i]nvocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (*quoting McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Accordingly, the Court concluded that ambiguous requests for counsel do not constitute an invocation of the right to counsel and therefore, do not trigger the Fifth Amendment's prohibition on further questioning. *See Davis*, 512 U.S. at 461. Moreover, the Court specifically refused to adopt a rule requiring officers to ask questions clarifying the accused's statements. *Id*. at 461-62.

The Tennessee Supreme Court adopted a similar standard to that enunciated in *Davis v. United States* that "[a]lthough a suspect need not speak with the discrimination of an Oxford don," the accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable officer would understand the statement to be a request for an attorney." *State v. Huddleston*, 924 S.W.2d 666, 669-70 (Tenn. 1996) (*quoting Davis*, 512 U.S. at 459). In *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013), the court, elaborating on the holding in *Huddleston*, held that the standard for a valid invocation of the right to counsel is the same under both Article I, Section 9 and the Fifth Amendment. The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable [police] officer . . . would understand the statement to be a request for an attorney." *Huddleston*, 924 S.W.2d at 670 (*quoting Davis*, 512 U.S. at 459). If the suspect fails to make such an unambiguous statement, police may continue to question him without clarifying any equivocal requests for counsel. *Id*.

The Defendant argues that the statements he made during the interview were unequivocal requests for counsel. We disagree. The Defendant waived his right to counsel at the beginning of his interview. Agent Bliss read the rights to the Defendant,

and the Defendant affirmed his understanding of the rights and waiver of those rights. The interview then began and the Defendant was talkative and provided much detail to questions regarding the history and relationship between him, M.D., and the victim. The Defendant discussed the animosity between M.D. and him regarding custody of and visitation with the children. Upon being asked whether he still had the emails in which M.D. refused to allow him to see his children, the Defendant said, ". . .I really do think that I need to have an attorney to sift through your interrogatories [to] make sure that you know you get the proper paper work . . . ." Later, the Defendant asked the investigators, "Can't I be honest with an attorney present?" To which Investigator Ivy responds, "Sure." When the Defendant again questioned, "I mean but doesn't it make sense that if I'm facing life in prison for these various accusations that I would want to have an attorney?" Investigator Ivy stated, "Well that's up to you." The Defendant then affirmed that detectives had reviewed the *Miranda* rights with him. We find these statements to be equivocal. *See, e.g., State v. Tammy Kay Scott*, No. E2012-02734-CCA-R3-CD, 2013 WL 6623750, at \*3 (Tenn. Crim. App., at Knoxville, Dec. 16, 2013) ("I think I need an attorney."), *no Tenn. R. App. P. application filed*; *State v. Michael James Bell*, No. E2008-014990CCA-R3-CD, 2010 WL 3612751, at \*24 (Tenn. Crim. App., at Knoxville, Sept. 17, 2010) ("I think I need to talk to a lawyer," "I think I need a lawyer," and "I might need a lawyer"), *perm. app. denied* (Tenn. Feb. 16, 2011); *State v. James Robert Ledford*, No. E1999-00917-CCA-R3-CD, 2000 WL 1211312, at \*9 (Tenn. Crim. App., at Knoxville, August 28, 2000) ("Don't I need to talk to a lawyer?"), *no Tenn. R. App. P. 11 application filed*.

Accordingly, we conclude that the Defendant's statements were equivocal requests for counsel and law enforcement officers were not required to cease questioning. Therefore, the trial court properly denied the Defendant's motion to suppress. The Defendant is not entitled to relief as to his issue.

## 2. Coercion

The Defendant asserts that his admission was involuntary because it was the product of police deception. Specifically, he points to "guarantees" of a lesser sentence and threats of a life sentence if he continued to deny the allegations. The State responds that the Defendant's confession was not coerced. We agree with the State.

The trial court denied the Defendant's motion to suppress statements due to coercive treatment, finding that, based upon the pleadings, the Defendant faced a potential sentence of 273 years, which is "tantamount to a Life sentence." Likewise, the trial court found the investigators' statements, that a trial court might mitigate his sentence if the contact were consensual rather than forcible, were not false. The trial court did note that statements regarding a maximum sentence if the Defendant "stopped

14

talking" were "inappropriate" but did not "amount to the level of an involuntary statement based on threats or coercion in violation of [the Defendant's] rights." The trial court did not find "that the [D]efendant was promised any leniency if he confessed" and concluded that the statement was voluntarily given."

"Confessions that are involuntary, i.e., the product of coercion, whether it be physical or psychological, are not admissible." *State v. Phillips*, 30 S.W.3d 372, 376 (Tenn. Crim. App. 2000) (citing *Rogers v. Richmond*, 365 U.S. 534, 540 (1961)). In order to make the determination of whether a confession was voluntary, the particular circumstances of each case must be examined. *Id*. at 377 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)). "Coercive police activity is a necessary prerequisite in order to find a confession involuntary." *Id*. (citing *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)). "The crucial question is whether the behavior of the state's officials was 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" *Id*. (quoting *Rogers*, 365 U.S. at 544); *see State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). "Advice to an individual concerning the consequences of a refusal to cooperate is not objectionable." *State v. Smith*, 933 S.W.2d 450, 456 (Tenn. 1996).

The evidence in the record does not preponderate against the finding of the trial judge that the Defendant's confession was voluntary. The Defendant was an adult at the time of the interrogation and demonstrated a level of sophistication and intelligence. The Defendant had received the benefit of the *Miranda* warnings, was interviewed for approximately three hours, and had not been extensively interrogated or mistreated in any way. The Defendant was allowed to take breaks whenever requested and responded in the affirmative each time one of the investigators asked if he was willingly speaking with them. There is no indication that he was not in full control of his emotions and reasoning powers. The investigators repeatedly encouraged the Defendant to tell "the truth" and "be honest." We do not find that the investigators misrepresented potential punishment to the Defendant or made "guarantees" to him in regard to sentencing.

Accordingly, the record does not preponderate against the trial court's finding that the Defendant's statement was voluntary and not the product of police coercion. The Defendant is not entitled to relief as to this issue.

### B. Violation of the Interstate Agreement on Detainers

The Defendant asserts that the seven-month delay by Florida authorities notifying him of Tennessee's detainer violated the prompt notification requirement of the Interstate Agreement on Detainers. It is based upon this violation that the Defendant asks this Court to vacate his judgments of conviction. The State responds that the Defendant has

15

failed to show any resulting prejudice from the delay and, therefore, is not entitled to relief. We agree with the State.

At the March 20, 2013 pretrial hearing, the Defendant's attorney acknowledged that he could not show prejudice for the delay "at this point in time." He then stated:

> So what I would ask Your Honor to do is once we are done with the testimony today, which I expect to be brief, I think that we can, at least, be done with respect to the suppression motions, but on the detainer motion and the pre-indictment delay, I would ask that if and when I can demonstrate some type of prejudice that I submit request to be heard on those particular issues.

The trial court responded that it was "more inclined to give [ ] a little more latitude" and it would "probably . . . grant that." The Defendant never submitted a request to be heard on these issues and did not raise this issue again until his motion for new trial. In an order issued March 31, 2013, the trial court stated:

> The [D]efendant alleges that he has been prejudiced by the 7 month delay in notifying him of the detainer. He argues that his memory was impacted and that he lost the opportunity to see concurrent sentences. The length of the delay is unreasonable and inexcusable. The only proof offered was in pleadings which stated that the authorities in Florida misplaced the paper work and Tennessee did not follow up on their request. The [D]efendant timely filed his objection and moved to dismiss the indictment. However there does not appear to be any prejudice to the [D]efendant. A review of the law indicates that the IAD does not require automatic dismissal for a violation and does not even make a provision for dismissal. Although the delay and the reason for the delay weigh in favor of the [D]efendant there does not appear to be any proof of prejudice to the [D]efendant. His rights to a speedy trial have not been impacted by this activity. Since there appears to be no provision in the law for dismissal of an indictment simply based on a delay of notification this Court finds no legal basis to grant the relief requested.

The Interstate Compact on Detainers is a uniform agreement, adopted by forty-eight states including Tennessee, which facilitates the interstate transfer of a prisoner for the purpose of disposing of the prisoner's pending out-of-state criminal charges, which may preclude the prisoner from early release consideration or alternatives to confinement. *See* T.C.A. § 40-31-101, et seq. (2012); *Nelms v. State*, 532 S.W.2d 923, 927 (Tenn. 1976). The stated purpose of the Interstate Compact is "to encourage the expeditious and

orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." T.C.A. § 40-31-101, art. I. This Court is to construe the provisions of the Interstate Compact liberally in favor of the defendants it was intended to protect. *Garmon*, 972 S.W.2d at 710. Its protections, however, are statutory, rather than constitutional or jurisdictional. *Id.* (citing *Grizzell v. Tennessee*, 601 F. Supp. 230 (M.D. Tenn. 1984)).

The Defendant relies on the provision in Article II(c) of the Interstate Compact, which provides:

> The warden, commissioner of corrections or other official having custody of the prisoner shall promptly inform the prisoner of the source and contents of any detainer lodged against the prisoner and shall also inform tthe prisoner of the right to make a request for final disposition of the indictment, information or complaint on which the detainer is based.

The State acknowledges that the almost seven-month delay between the Florida officials' receipt of the Tennessee detainer and the Defendant's receipt of the notice is "probably not 'prompt' within the meaning of the Interstate Compact." The State, however, relies on this Court's previous holdings that, other than the 180-day speedy trial requirement, errors under the Interstate Compact do not require dismissal. *See Ball v. State*, 891 S.W.2d 240, 241-42 (Tenn. Crim. App. 1994); *State v. Tyson*, 603 S.W.2d 748, 751 (Tenn. Crim. App. 1980); *State v. Graham*, No. 754, 1987 WL 18384, at *4 (Tenn. Crim. App. Oct. 14, 1987), *perm. app. denied* (Tenn. Dec. 28, 1987).

In our view, Article III (c) places a requirement on the receiving state, Florida, not the requesting state, Tennessee. The statute does not provide nor do we find any logic in holding the requesting state responsible for any errors of the receiving state absent some form of prejudice to a defendant. Furthermore, in this case, the Defendant conceded that he was not prejudiced by the almost seven month delay. The Defendant is not entitled to relief as to this issue.

### C. Bill of Particulars

On appeal, the Defendant asserts that he was denied his right to a fair trial because the trial court refused to grant his motion for a bill of particulars. He contends that "the State did nothing to adequately identify the offense." The State responds that the trial court properly denied a bill of particulars based upon the State's open file discovery policy. We agree with the State.

17

Use of a bill of particulars is established by Tennessee Rule of Criminal Procedure 7(c), which states that "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." The decision whether to order a bill of particulars lies in the discretion of the trial court, and this court will not reverse the trial court's denial of a bill of particulars absent a showing that the trial court abused its discretion. *See State v. Stephenson*, 878 S.W.2d 530, 539 (Tenn. 1994).

The purpose of the bill of particulars is to provide the accused with sufficient information about the offense alleged in the indictment to permit the accused (a) to prepare a defense to the offense, (b) to avoid prejudicial surprise at trial, and (c) to enable the accused to preserve a plea of double jeopardy. *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991).; *State v. Campbell*, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995); *State v. Perkinson*, 867 S.W.2d 1, 5 (Tenn. Crim. App. 1992). In *State v. Byrd*, our Supreme Court recognized that in most child sex abuse cases the state is unable to offer the specific date when an alleged offense occurred. *Byrd*, 820 S.W.2d at 741. Nevertheless, a trial court should require the state to furnish what information it may have in its possession concerning the time when the alleged offense was committed. *Byrd*, 820 S.W.2d at 741; *see Campbell*, 904 S.W.2d at 611-12.

"'The test in passing on a motion for a bill of particulars should be whether it is necessary that [the] defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.'" *State v. Hicks*, 666 S .W.2d 54, 56 (Tenn. 1984) (quoting 1 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE, CRIMINAL, § 129 (1982)). If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. *Id.* A bill of particulars is not intended to be a means of learning the State's evidence and theories, although to the extent the information sought is necessary, it will be required, even if to do so discloses the State's evidence or theories. *Id.*

On appeal, the Defendant asserts that he was denied his right to a fair trial because the trial court refused to grant his motion for a bill of particulars. The Defendant, however, has not argued how any information from a bill of particulars would have changed his trial preparation or defense. Further, the Defendant has not said how his defense was hampered by any such withheld information. In other words, the Defendant has not stated how he was prejudiced by the lack of a bill of particulars. *See State v. Thomas Wayne Overbay*, No. E1999-00840-CCA-R3-CD, 2000 WL 1246617, at *6 (Tenn. Crim. App., at Knoxville, Sept. 5, 2000), *perm. app. denied* (Tenn. April 24, 2001); *State v. Michael Thomason*, No. W1999-02000-CCA-R3-CD, 2000 WL 298695, at *8 (Tenn. Crim. App., at Jackson, Mar. 7, 2000), *no Tenn. R. App. P. 11 application filed*. We note that the Defendant was provided with all of the information in the State's

possession, and the State was required to make an election of offenses at trial. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

## D. Sufficiency of the Evidence

The Defendant asserts that the State failed to prove the elected offense and, in the alternative, that the election was insufficient. The State responds that the election was adequate to prevent a patchwork verdict, and the evidence was sufficient to convict the Defendant of the offense elected.

At trial, the State made the following election:

> The State has elected to submit for your consideration the alleged act of oral sex (cunnilingus) of [the victim] by the Defendant using his mouth, nose and tongue that [the victim] referred to as "going down on me" occurring after [the victim's] 11[th] birthday on 7/29/2001 but before the birth of her sister on 8/26/2001.

### 1. The Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

19

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Tennessee Code Annotated defines the crime of rape of a child as "the unlawful sexual penetration of a victim by the defendant . . . if such victim is less than thirteen (13) years of age." T .C.A. § 39-13-522(a) (2014). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7) (2014).

The evidence, considered in the light most favorable to the State, showed that the victim began living with the Defendant in the fall of 2000. Soon after she moved in, while her mother, M.D., was at work, the Defendant showed the victim pornography and

began inappropriately touching the victim.  The victim said that the Defendant told her that he loved her and wanted to make her feel good.  This activity continued and progressed by the summer of 2001 when the Defendant began performing oral sex on the victim.  The victim testified that this occurred daily after her eleventh birthday on July 29, 2001, until around the time of her sister's birthday at the end of August.  The contact became less frequent when she returned to school in the fall of 2001.  The victim described the Defendant as using his nose and his mouth on her vagina during these encounters.  This evidence is sufficient to show that the Defendant unlawfully penetrated the then eleven-year old victim when he performed cunnilingus on her.  The Defendant is not entitled to relief as to this issue.

As to the Defendant's contention that the State was required to prove the Defendant penetrated the victim with his tongue, we disagree.  The Supreme Court recently addressed this issue stating, "the election requirement applies to offenses, not to the facts supporting each element of the offense.  This is true because a jury is not required to 'unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the [defendant] is guilty of the crime charged.'"  *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015) (quoting *State v. Adams*, 24 S.W.3d 289, 297 (Tenn. 2000).  The jury unanimously concluded that the Defendant sexually penetrated the victim when he performed cunnilingus on her.

## 2. Election of Offenses

The Defendant alternatively argues that the election insufficiently identified one specific event thereby precluded a unanimous verdict.  The State responds that the election was sufficient to prevent a "patchwork verdict."  We agree with the State.

The Tennessee Supreme Court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim."  *State v. Johnson*, 53 S.W.3d 628, 630 (Tenn. 2001) (citing *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)).  "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence."  *Johnson*, 53 S.W.3d at 631 (citing *Brown*, 992 S.W.2d at 391).  The right to a unanimous verdict "requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a 'patchwork verdict' based on different offenses in evidence."  *Kendrick*, 38 S.W.3d at 568 (quoting *Shelton*, 851 S.W.2d at 137).

21

In a recent opinion, however, our Supreme Court acknowledged that "there is no right to a perfect election," and that the election requirement may be satisfied in different ways. *Knowles*, 470 S.W.3d at 424. The *Knowles* Court stated as follows:

> [I]n *State v. Shelton*, this Court detailed how the State may sufficiently elect a particular offense in a sex crimes case. While the *Shelton* Court held that merely specifying a span of days wherein the abuse was alleged to have occurred was not a sufficient election, the Court emphasized that "the [S]tate is not required to identify the particular date of the chosen offense" and noted that "a particular offense can often be identified without a date." *Shelton*, 851 S.W.2d at 137. In the absence of electing a specific date, the prosecutor may "identify a particular type of abuse and elect that offense" if the victim suffered multiple types of abuse. *Id*. at 138. Additionally, the prosecutor may ask the child victim "to describe unique surroundings or circumstances that help to identify an incident," which may include "identify[ing] an assault with reference to a meaningful event in [the child's] life, such as the beginning of school, a birthday, or a relative's visit." *Id*. Ultimately, this Court in *Shelton* concluded that "[a]ny description that will identify the prosecuted offense for the jury is sufficient." *Id*. (emphasis added).

In this case, the victim identified the Defendant's conduct as occurring after her eleventh birthday, July 29, 2001, but before her sister's birth, August 26, 2001. The State did not provide a specific date but specified a particular type of abuse, oral sex, and elicited circumstances surrounding the event, including the victim's eleventh birthday and the birth of the victim's sister. The victim described a routine and the Defendant's use of his mouth and nose in performing oral sex on the victim. In our view, this description "adequately describes the prosecuted offense for the jury." *Shelton*, 851 S.W.2d at138. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

22